R. Andrew Santillo
Mark J. Gottesfeld
**WINEBRAKE & SANTILLO, LLC**
Twining Office Center
715 Twining Road, Suite 211
Dresher, Pennsylvania 19025
Phone:  215.884.2491
Facsimile:  215.884.2492
E-mail:  asantillo@winebrakelaw.com
E-mail:  mgottesfeld@winebrakelaw.com

*Attorney for Plaintiffs (Additional Counsel Listed on Signature Page)*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| **ANTHONY DEMARCO, EDWARD HART, MICHAEL HEALEY, ROGER JOHNSON, JR., MARK KORNYTCHUK, JOSEPH MANZO, ALEX MIROSH, SULEYMAN ALIYEV, CARLOS BELTRE PEREZ, DIOGENES POLANCO, and MARIO ROMERO,**<br><br>Plaintiffs,<br><br>v.<br><br>**DIRECTV, LLC, MULTIBAND CORP., and DIRECTSAT USA, LLC,**<br><br>Defendants. | **CIVIL ACTION**<br><br>**Case No.  14-cv-4623 PGS TJB** |

## SECOND AMENDED COMPLAINT

### ADDRESSES

The street and post-office addresses of the Plaintiffs in this civil action are as follows:

a. Anthony DeMarco, 733 Baltic Drive, Brick, New Jersey 08723;

b. Edward Hart, 1435 Cable Avenue, Beachwood, New Jersey 08722;

c. Michael Healey, 30 East 49th Street, Bayonne, New Jersey 07002;

d. Roger Johnson, Jr., 269 Brick Avenue, Bayville, New Jersey 08721;

e. Mark Kornytchuk, 14 N Binnacle Drive, Little Egg Harbor Township, New Jersey 08087;

f. Joseph Manzo, 269 Brick Avenue, Bayville, New Jersey 08721;

g. Alex Mirosh, 4750 Bedford Avenue, Apt 1F, Brooklyn, New York 11235;

h. Suleyman Aliyev, 1245 Avenue X, Apt. #B5, Brooklyn, New York 11236;

i. Carlos Beltre Perez, 23 Cedar St. #1, Garfield, New Jersey 07026;

j. Diogenes Polanco, 63 Spencer Avenue, Clifton, New Jersey 07013;

k. Mario Romero, 15 ½ Loomis Street, Apt. 1, Elizabeth, New Jersey 07206.

Plaintiffs Anthony DeMarco, Edward Hart, Michael Healey, Roger Johnson, Jr., Mark Kornytchuk, Joseph Manzo, Alex Mirosh, Suleyman Aliyev, Carlos Beltre Perez, Diogenes Polanco, and Mario Romero, by and through their undersigned counsel, for their individual complaints against DIRECTV LLC ("DIRECTV"); and DirectSat USA, LLC ("DirectSat"), and Multiband Corp. ("Multiband"), ("Provider Defendants") (collectively with DIRECTV, "Defendants") hereby state as follows:

## NATURE OF SUIT

1.       DIRECTV—the largest provider of satellite television services in the United States—is responsible for a far reaching "fissured employment"[1] scheme.  In order to expand and service its customer base (topping more than 20 million domestic subscribers), DIRECTV

---

[1] Fissured employment describes the practice of a large company attempting to shed its role as a direct employer and purporting to disassociate itself from the workers responsible for its products (albeit maintaining tight control over the method, manner, quantity, and quality of production). The practice of outsourcing an employer's responsibilities and obligations to subordinate entities and subcontractors is highly profitable for companies like DIRECTV, but results in stagnation of wages and benefits and causes rampant violations of wage-and-hour laws. *See e.g.*, David Weil, *The Fissured Workplace: Why Work Became So Bad for So Many and What Can Be Done to Improve It* (Harvard Univ. Press, Feb. 3, 2014);  David Weil, *Enforcing Labour Standards in Fissured Workplaces: The US Experience*, 22 Econ. & Lab. Rel. Rev. 2, at 33-54 (July 2011).

has engaged tens of thousands of technicians—including each of the Plaintiffs in this case—to install and repair its satellite systems. Although DIRECTV requires these technicians to drive a DIRECTV-branded vehicle, wear a DIRECTV uniform, and perform their work according to DIRECTV's exacting policies and procedures, DIRECTV disclaims any legal relationship with these workers, tagging them instead as "independent contractors" or employees of subordinate entities (including Defendants Multiband and DirectSat). But it is the economic reality of the relationship—not DIRECTV's self-serving labels—that controls whether Plaintiffs meet the definition (among the broadest ever legislated) of an "employee" under the Fair Labor Standards Act ("FLSA").

2.     Plaintiffs' claims squarely challenge this dangerous trend, and are not the first to do so. The U.S. Department of Labor ("DOL") has made a priority of investigating and exposing multi-party business arrangements that shirk compliance with the FLSA.  *See* http://wage-hour.net/post/2012/09/25/Fissured-Industry-Enforcement-Efforts-Continue.aspx (last visited Feb. 25, 2015).   The DOL's Misclassification Initiative, launched under Vice President Biden's Middle Class Task Force, is aggressively combating this pervasive issue in order to restore rights denied to individuals.[2]   In September 2011, then-Secretary of Labor Hilda L. Solis announced the signing of a Memorandum of Understanding between the DOL and the Internal Revenue Service (IRS), under which the agencies combine resources and share information to reduce the

---

[2]  "The misclassification of employees as something else, such as independent contractors, presents a serious problem, as these employees often are denied access to critical benefits and protections—such as family and medical leave, overtime compensation, minimum wage pay and Unemployment Insurance—to which they are entitled. In addition, misclassification can create economic pressure for law-abiding business owners, who often struggle to compete with those who are skirting the law. Employee misclassification also generates substantial losses for state Unemployment      Insurance      and      workers'      compensation      funds."      *See* http://www.dol.gov/opa/media/press/whd/ WHD20120257.htm (last visited Jan. 25, 2016); *see generally*, DOL Misclassification Initiative, available at http://www.dol.gov/whd/workers/misclassification/ (last visited Jan. 25, 2016).

incidence of misclassification of employees, to help reduce the tax gap, and to improve compliance with federal labor laws.  The DOL's Wage and Hour Division is also partnering with individual states whose workers are being subjected to this practice.[3]

3.     The individual Plaintiffs joined herein intend to prove in this litigation that they are legally employed by DIRECTV and, where applicable, Multiband and/or DirectSat, and are entitled to the protections of the FLSA.

## JURISDICTION AND VENUE

4.     The FLSA authorizes court actions by private parties to recover damages for violation of the FLSA's wage and hour provisions. Jurisdiction over Plaintiffs' FLSA claims is based upon 29 U.S.C. § 216(b) and 28 U.S.C. § 1331.

5.     Venue in this district is proper pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events giving rise to the claims alleged herein occurred in this judicial District and Defendants are each subject to personal jurisdiction in this District. Further, upon information and belief, Defendants have each consented to personal jurisdiction and venue in the District of New Jersey for the claims alleged herein.[4]

---

[3]  *See, e.g.*, DOL Misclassification Initiative, *available at* http://www.dol.gov/whd/workers/misclassification/#stateDetails (last visited Jan. 25, 2016).

[4] *See also* Judge Collins' Order transferring this action to the District of New Jersey: "[E]ach Defendant does business nationwide and/or in the specific state to which movants seek to transfer venue. Furthermore, having moved for transfer, the Defendants evidently consent to jurisdiction in these venues. As such, the transferee districts would be able to exercise personal jurisdiction over the Defendants. Because all of the cases assert federal claims (under the Fair Labor Standards Act), it is also clear that the transferee courts would have subject matter jurisdiction. Finally, the transferee courts are proper venues because each of the Defendants in each case is subject to personal jurisdiction in those districts, and, alternatively, the events giving rise to the claims occurred in those districts because those districts are where Plaintiffs worked and were allegedly refused pay." *DeMarco v. DirecTV*, Case No. 13-8127 ABC (Ex) (C.D. Cal., Doc. 64, at 4).

**DEFENDANTS**

6.      DIRECTV, Inc. is a Delaware corporation with its principal place of business in El Segundo, California. DIRECTV, Inc. does business as DIRECTV Home Services in the State of California and nationwide. In December 2011, DIRECTV, Inc. merged with another DIRECTV entity, DIRECTV Operations, LLC. The resulting entity is known as DIRECTV, LLC, which is a Delaware corporation with its principal place of business in El Segundo, California.  In May 2014, AT&T Inc. entered into an Agreement and Plan of Merger, in which DIRECTV will merge into and become a wholly owned subsidiary of AT&T Inc.

7.      Defendant Multiband Corp. is a Minnesota corporation, based in New Hope, Minnesota.

8.      Defendant DirectSat USA, LLC is a Delaware limited liability company with its principal place of business in King of Prussia, Pennsylvania.

9.      All Plaintiffs performed work for DIRECTV and, where applicable, Multiband and/or DirectSat in New Jersey.

10.      All Defendants do business or have done business in New Jersey.

**COMMON FACTUAL ALLEGATIONS**

**DIRECTV's Fissured Employment Scheme: The Provider Network**

11.      At all relevant times, Plaintiffs worked as satellite television installation technicians. Plaintiffs' principal job duty as technicians was to install and repair DIRECTV satellite television service.

12.      DIRECTV controls and manages its nationwide corps of service technicians in two ways: (1) by directly employing service technicians ("W-2 Employees"); and (2) through an employment network of service providers (the "Provider Network") consisting of Home Service

Providers, including Multiband and DirectSat ("HSPs"), Secondary Service Providers ("Secondary Providers"), subcontractors, and service technicians (treated as 1099 "independent contractors").

13. DIRECTV operates its Provider Network nationwide from its headquarters in El Segundo, California.

14. Defendants are each engaged in interstate commerce and, upon information and belief, Defendants each gross more than Five Hundred Thousand Dollars in revenue per year.

15. Upon information and belief, at all relevant times, DIRECTV was the primary, if not the only, client of the HSPs and Secondary Providers (HSPs and Secondary Providers are collectively referred to herein as "Providers") and was the source of substantially all of each Provider's income.

16. During the relevant time period, and as alleged in more detail infra, many HSPs were subsumed by DIRECTV through a series of mergers and acquisitions.

17. By design, the Provider Network is organized and operated as a top-down structure:  DIRECTV sits atop the Provider Network, controlling the employment network through contracts with HSPs and Secondary Providers; the HSPs and Secondary Providers, in turn, enter contracts with a patchwork of largely captive entities that DIRECTV generally refers to as subcontractors; and the subcontractors enter contracts with the technicians who install the satellite television equipment. In some instances, the HSPs or Secondary Providers contract directly with the technicians.

18. Multiband and DirectSat performed similar, middle-management functions between DIRECTV and those technicians described below as being employed by Multiband and/or DirectSat under the FLSA. In this role, Multiband and DirectSat worked directly in the

interest of DIRECTV. Pursuant to the Home Service Provider Agreement between them, DirectSat and Multiband, like all HSPs in DIRECTV's Provider Network, administered DIRECTV's technician hiring criteria, trainings, and certifications, administered DIRECTV Work Orders that described and scheduled each technician's work, administered and supervised technicians' work to ensure compliance with DIRECTV's means and methods of equipment installation and customer satisfaction policies and practices, and administered and supervised DIRECTV's piece-rate payment system pursuant to which each technician was only paid for line items contained in DIRECTV's Work Orders "closed" by the technician. That is, DIRECTV set forth the qualification "hiring" criteria for the employees and contractors of DirectSat and Multiband. DirectSat and Multiband then implemented and enforced those qualifications. Similarly, DIRECTV set the requirements for how the technicians were to perform their work. In turn, DirectSat and Multiband monitored and enforced compliance with those requirements..

19.     Multiband and DirectSat each maintained, among other documents, a contractor file for all technicians working under their aegis, including ostensible 1099 technicians or "independent contractors" (though, these technicians were actually "employees" under the FLSA). The contents of these contractor files were regulated and audited by DIRECTV. These contractor files are analogous to a personnel file.

20.     Multiband and DirectSat had the power to enter into and terminate contracts with the 1099 technicians working under their aegis. In this way, Multiband and DirectSat had the power to hire and fire those technicians.

21.     Multiband and DirectSat maintained warehouses and other facilities where the 1099 technicians working under their aegis had to go to pick up certain equipment and receive

certain trainings. The equipment belonged to DIRECTV and the trainings were required by DIRECTV.

22.     No matter how employed, whether directly or as part of the Provider Network, each DIRECTV technician must install DIRECTV's satellite television equipment according to the same policies, procedures, practices, and performance standards as required by DIRECTV.

23.     For those technicians who work as part of the Provider Network, DIRECTV's policies, procedures, practices, performance standards, and payment method requirements are described, mandated, and imposed through the Provider Agreements, Secondary Provider Agreements, and Services Provider Agreements.

24.     DIRECTV obligates the Providers to ensure that the technicians perform their work as specified by the Provider Agreements, and, accordingly, the Subcontractor Agreements and Technician Agreements incorporate the provisions of the Provider Agreements.

25.     The Provider Agreements enable DIRECTV to control nearly every facet of each technician's work, down to the "DIRECTV" shirts they are required to wear and the "DIRECTV" ID card they must show customers.

26.     DIRECTV assigns each technician a scope of work described in a Work Order that DIRECTV itself delivers to each technician via a centralized computer software system that DIRECTV controls. DIRECTV mandates particularized methods and standards of installation to assure DIRECTV's equipment is installed according to the dictates of DIRECTV's policies and procedures. As a consequence, each technician's essential job duties are virtually identical no matter where performed and no matter which intermediary the technician is ostensibly working for.

27.     Upon information and belief, DIRECTV required, through its Provider Agreements, HSPs to sign subcontractor agreements with subcontractors, who, in turn entered into contracts with technicians so that those technicians would be (mis)classified as 1099 independent contractors. These so-called "1099" technicians performed the same work, according to the same policies and practices described herein, and were paid according to the same piece-rate system as those technicians who DIRECTV classified as "in-house" W-2 technicians.

28.     Plaintiffs typically started their workdays after receiving daily work schedules assigned through DIRECTV's dispatching systems. DIRECTV used a database program known as SIEBEL to coordinate the assignment of particular work orders to technicians using each technician's unique "Tech ID Number."

29.     Each technician's unique "Tech ID Number" connects them to a HSP. The HSP serves as a middle-man between DIRECTV and either the W-2 technician or the subcontractor and 1099 technician.

30.     After receiving their daily work schedules, Plaintiffs typically called the customer contact for each of their assigned jobs to confirm the timeframe within which the technician expected to arrive at the customer's home. Plaintiffs then traveled to their first assigned job and thereafter continued to complete the jobs assigned by DIRECTV in the prescribed order on the daily work schedule. Upon arriving at each job site, Plaintiffs were required to check-in by telephone with DIRECTV via its dispatching system. At the end of an assigned job, Plaintiffs were required to report to DIRECTV that the installation was complete and, thereafter, worked directly with DIRECTV employees to activate the customer's service.

31.     When performing DIRECTV's work, Plaintiffs were required to purchase and wear a uniform with DIRECTV insignia on it. Additionally, Plaintiffs were required to display DIRECTV insignia on vehicles driven to customers' homes for installations.

32.     Although DIRECTV and the Providers control nearly every aspect of the technicians' work, Defendants insist that the technicians are not their employees, claiming that in some instances they are "independent contractors."

33.     Plaintiffs will show that the Provider Network is purposefully designed to exercise the right of control over DIRECTV's technician corps while avoiding the responsibility of complying with the requirements of the FLSA.

**DIRECTV's Workforce Consolidation: Acquisition of Providers by Defendants**

34.     DIRECTV's control over its purportedly independent provider partners is integral to its fissured employment scheme. So much so that DIRECTV regularly infuses these partners with what it labels internally as "extraordinary advance payments" in order to keep their dependent operations afloat while feigning an outward appearance of independence. When litigation or other circumstances make the "independent" relationship a negative for DIRECTV, DIRECTV simply absorbs these entities by acquisition.

35.     The absorption by DIRECTV is seamless, simply a resetting of titles without the functional modifications that normally accompany an arm's length acquisition. To date, there are only three "independent" HSPs still in operation—including the named Provider Defendants, DirectSat and Multiband. Since DIRECTV developed its HSP Network, DIRECTV or one of these three remaining HSPs has purchased at least thirteen prior HSPs.[5]  Below is a description

---

[5] These include AeroSat, Bruister, Bluegrass Satellite and Security, ConnecTV, Directech NE, Directech SW, DTV Home Services II, LLC, Halsted Communications, Ironwood

of the prior HSPs for which the Plaintiffs technicians worked and how those HSPs were ultimately acquired by DIRECTV, Multiband, or DirectSat.

**Ironwood Communications**

36.     Upon information and belief, DIRECTV acquired Ironwood Communications in July 2008, including all of Ironwood's facilities. After the acquisition, DIRECTV conducted business out of Ironwood's locations, and personnel from Ironwood worked for DIRECTV. Many of Ironwood's employees were hired by DIRECTV.

37.     Upon information and belief, working conditions for installation technicians who worked for Ironwood remained substantially the same after DIRECTV acquired Ironwood. Likewise, technicians, including Plaintiffs, had substantially the same job(s) after DIRECTV acquired Ironwood. There were no broad changes to job functions, job titles, job responsibilities, and/or supervisors, and technicians' pay remained the same.

**Directech NE**

38.     Upon information and belief, Multiband acquired all of Directech NE in December 2009, including all of its facilities. After the acquisition, Multiband conducted business out of Directech NE's locations, and personnel from Directech NE worked for Multiband. Many of Directech NE's employees were hired by Multiband.

39.     Upon information and belief, working conditions for installation technicians who worked for Directech NE remained substantially the same after Multiband acquired Directech NE. Likewise, technicians, including Plaintiffs, had substantially the same job(s) after Multiband acquired Directech NE. There were no broad changes to job functions, job titles, job responsibilities, and/or supervisors, and technicians' pay remained the same.

---

Communications, JP&D Digital Satellite, Michigan Microtech, Mountain Satellite and Security, and Skylink.

**The Economic Reality: DIRECTV Employs the Technicians through its Provider Network**

40.     An "employer" includes "any person acting directly or indirectly in the interest of an employer in relation to an employee," 29 U.S.C. § 203(d), and an employee may be employed by more than one employer at the same time. Employment status for purposes of wage and hour law is defined by the real economic relationship between the employer(s) and the employees. An employee can have more than one employer, each of whom is individually responsible for complying with the FLSA—which includes ensuring that its workers are properly paid.

41.     Here, through its Provider Network, DIRECTV establishes, defines, and controls the economic relationship between DIRECTV and its technicians. Among other indicia of employment described herein, DIRECTV controls the details of Plaintiffs' day-to-day work and the piece-rate compensation method by which technicians are paid for their work.

42.     Although dubbed W-2s of DirectSat or Multiband, or as "independent contractors," Plaintiffs are as a matter of economic reality, wholly dependent on DIRECTV and, where applicable, DirectSat and/or Multiband.

43.     DIRECTV exerts significant control over the Providers and Plaintiffs regarding the essential terms and conditions of Plaintiffs' employment. Specifically, and as alleged in more detail below:

     a.  DIRECTV sets prerequisites for hiring and retains ultimate authority to terminate technicians, including Plaintiffs;

     b.  DIRECTV controls and supervises Plaintiffs' work schedules, the means and methods technicians are required to follow to install DIRECTV equipment, and conditions of employment including performance standards that affect, among

other indicia of employment, whether and what type of Work Orders each
technician receives;

c.   DIRECTV sets the rate of payment and uses a piece-rate payment scheme
throughout its Provider Network, which pays technicians only for line items
contained in DIRECTV Work Orders that the technician "closes" to DIRECTV's
satisfaction.

d.   DIRECTV maintains certain payroll-related employment information in its
SEIBEL system, and requires its Providers to maintain other employment records
for Plaintiffs subject to DIRECTV's inspection.

44.   DirectSat's employment of Plaintiffs Mirosh, Polanco, and Romero is not
disassociated from DIRECTV's employment of these individuals. 29 C.F.R. § 791.2.

45.   Multiband's employment of Plaintiffs DeMarco, Hart, Johnson, Kornytchuk,
Manzo, and Aliyev is not disassociated from DIRECTV's employment of these individuals. 29
C.F.R. § 791.2.

46.   Plaintiffs' work benefits DIRECTV and, where applicable, DirectSat and/or
Multiband.

47.   Providers such as DirectSat and Multiband act directly or indirectly in
DIRECTV's interest in relation to Plaintiffs who bring claims against both.

48.   DIRECTV controls DirectSat's and Multiband's employment of the Plaintiffs
who bring claims against both.

49.   Through the Provider Network, DIRECTV establishes, defines, and controls the
economic relationship between DIRECTV and Plaintiffs. DIRECTV effectively controls the

economic realities of the technicians' work; indeed, the technicians are economically dependent on DIRECTV.

50.     Through the Providers, including DirectSat and Multiband, DIRECTV exercises significant control over the details of Plaintiffs' day-to-day work and the piece-rate compensation method by which technicians are paid for their work.

51.     DIRECTV has purposefully structured a significant portion of its work force—those treated as 1099 independent contractors—through detailed contractual arrangements with sophisticated HSPs such as DirectSat. Through these HSPs, DIRECTV imposes its policies and procedures upon technicians, while masking that DIRECTV and the HSP control the technicians' hiring and firing, together with each technician's piece-rate pay through subordinate subcontractors, allowing DIRECTV and (as to 1099s) DirectSat and Multiband to disclaim any direct hiring, firing, or compensation of their technician work force.

52.     DIRECTV's Provider Network has been purposefully designed to circumnavigate the four-factor test, but it cannot avoid the economic reality of the circumstances here.

53.      "[A]n entity can be a joint employer under the FLSA even when it does not hire and fire its joint employees, directly dictate their hours or pay them."

54.     Although DIRECTV engaged, through detailed contractual arrangements, middle men to administer the physical hiring, firing, payroll, and recordkeeping of its workforce, the economic reality is that DIRECTV (and, where applicable DirectSat and/or Multiband) is the employer. The broad language of the FLSA is expressly designed to cover such indirect employment arrangements.

*Factor One: Hiring and Firing*

55.　Directly and indirectly, DIRECTV has the power to hire and fire Plaintiff technicians.

56.　Although DIRECTV may permit subcontractors to accept applications and conduct interviews, it is DIRECTV that sets the fundamental prerequisites of employment for all of its technicians, regardless of any additional requirements or policies.

57.　DIRECTV required that Plaintiff technicians had to pass a background check and nine-panel drug screening, conducted by a DIRECTV-approved vendor; and successfully obtain a certification from the Satellite Broadcasting & Communications Association ("SBCA") and complete SBCA  training before any Plaintiff technician could be assigned DIRECTV work orders.

58.　Although DIRECTV grants Providers and/or subcontracting entities the authority to terminate or discipline technicians, it is DIRECTV who controls the flow of work, passed on a daily basis from DIRECTV to each technician via his or her technician ID number, which DIRECTV assigns.

59.　DIRECTV has the unconditional and ultimate authority to deauthorize a technician ID, effectively preventing that technician from receiving work.

*Factor Two: Supervision and Control*

60.　Directly and indirectly, DIRECTV supervises and controls Plaintiffs' work schedules and conditions of employment.

61.　DIRECTV utilizes a network of field managers to oversee the work performed by Plaintiffs.

62.　DIRECTV monitors and evaluates individual technicians' performance.

63.     For example, DIRECTV conducts customer satisfaction surveys with customers after the technicians complete their work. Through these surveys, DIRECTV evaluates the performance of technicians on how well they adhered to DIRECTV mandated performance metrics such as whether the technician showed a picture ID, removed all waste, as well as the technician's overall professionalism. DIRECTV maintains and distributes lists of the poorly performing technicians by designated market area labeling them "Bottom Technicians."

64.     DIRECTV also monitors and evaluates the performance of technicians against a DIRECTV-designed "metrics matrix" which measures such things as whether a service called occurred within seven days, whether the "on time guarantee" was met, the technician's score on the customer satisfaction index, and the percentage of work orders that resulted in an escalation. When technician performance against these metrics fails to meet DIRECTV's expectations, DIRECTV managers will send communications to its contractors listing the under-performing technicians by name and demanding improvement.

65.     DIRECTV controls the work of the technicians by, among other things, creating and delivering work schedules directly to individual Plaintiff technicians on a daily basis, via a technician ID that DIRECTV creates and assigns. And although DIRECTV may not be physically "looking over the shoulder" of each of its technicians as they work, DIRECTV has a protocol in place by which it can monitor and track the technicians' locations and job progress through the workday, and it maintains this information in its computer system.

66.     DIRECTV also controls the Plaintiffs' work by dictating standards for Plaintiffs' vehicles, clothing, appearance, and representations to customers.

67.     DIRECTV requires and trains Plaintiffs to hold themselves out to DIRECTV's customers as agents of DIRECTV.

68. DIRECTV controls how installations are to be completed, by promulgating detailed instructions to Plaintiffs and its other technicians. Plaintiffs received these instructions and performed the work as DIRECTV required. By requiring that Plaintiffs comply with DIRECTV's instructions, Plaintiffs were forbidden to exercise meaningful discretion in how they performed installations.

69. DIRECTV develops and publishes training materials that technicians such as Plaintiffs are required to review.

*Factor Three: Rate and Method of Payment*

70. Directly or indirectly, DIRECTV controls Plaintiffs' rate and method of payment.

71. Although DIRECTV allows the HSPs or subcontracting entities to cut the checks, the funds backing those checks come from DIRECTV. And the amounts paid to the technicians are based on DIRECTV's records of work orders performed by those technicians.

72. As to the method of payment, all Plaintiffs were paid using the piece rate compensation scheme that is used throughout DIRECTV's Provider Network. Under that scheme, DIRECTV sets an amount it is willing to pay for certain defined tasks—which do not include all tasks that technicians must perform—and then transfers payment to its Providers to be passed on to the technicians. DIRECTV's records of work performed and payment owed are then accessed by the Providers to calculate the pay ultimately provided to the technicians.

73. Through the Providers, DIRECTV also determined whether Plaintiffs' work merited compensation. Among other controls, DIRECTV defined Plaintiffs' compensable and non-compensable work and imposed "rollbacks" and "chargebacks," thereby setting Plaintiffs' rate of pay on a piece-rate basis tailored to achieve its business purposes.

74. DIRECTV and Providers' personnel reviewed Plaintiffs' work, and imposed chargebacks and/or rollbacks based on those reviews.

75. Each technician, regardless of HSP, is economically dependent on DIRECTV. Through its contractual arrangements with the HSPs, including DirectSat and Multiband, DIRECTV controls the purse strings.

*Factor Four: Control of Records*

76. Directly or indirectly, DIRECTV maintains Plaintiffs' employment-related records.

77. Although DIRECTV keeps its file cabinets clean, it contractually requires the HSPs such as DirectSat and Multiband to retain paperwork/personnel files on each of its technicians, subject to DIRECTV's inspection at any time.

78. And DIRECTV's computer system contains detailed work order, performance, personal, and other payroll data for each technician.

79. These policies and practices, dictated by DIRECTV and enforced by DirectSat and Multiband, accomplish two, interrelated purposes: they ensure DIRECTV controls its technicians' work, while deliberately disclaiming their status as employees under federal employment laws.

80. DIRECTV willfully structures its Provider Network to mask the economic realities of its employment relationship with Plaintiffs.

81. Through the Provider Network, DIRECTV imposed its policies and practices uniformly, which created an economic reality driven by its control over Plaintiffs and their work, sufficient to establish that DIRECTV, and where applicable, DirectSat and/or Multiband, are Plaintiffs' employers subject to liability under the FLSA.

**The Piece-Rate System: DIRECTV's Unlawful Payment Scheme**

82.     As with other aspects of Plaintiffs' work, DIRECTV effectively controlled Plaintiffs' pay through the common policies and practices mandated in its Provider Agreements.

83.     Every Plaintiff was paid pursuant to the piece-rate payment scheme that is utilized throughout DIRECTV's network.

84.     The FLSA permits employers to pay on a piece-rate basis as long as the employer pays for all hours worked, including non-productive hours, and pays a premium for hours worked over forty in a week, based on the employee's regular rate. See 29 U.S.C. § 207(a)(g); 29 C.F.R. 778.318(a).

85.     The employer and employee may agree, prior to work commencing, that the piece-rate pay includes pay for productive and nonproductive hours, but where there is no agreement, the FLSA is not satisfied. See 29 U.S.C. § 207(g) (employer's method for calculating the overtime premium must be made "pursuant to an agreement or understanding arrived at between the employer and the employee before performance of the work."); 29 C.F.R. 778.318(c) (where it is "understood by the parties that other compensation received by the employee is intended to cover pay for such hours" . . . . "[I]f that is the agreement of the parties, the regular rate of the piece worker will be the rate determined by dividing the total piece work earnings by the total hours worked (productive and nonproductive) in the workweek.")

86.     There was no contract, memorandum, or other document between Plaintiffs and Defendants properly memorializing or explaining this pay system.

87.     Under this system, Plaintiffs were not paid for all hours they worked for Defendants. Rather, they were paid on a per-task (a/k/a piece rate) basis for satisfactorily completing a DIRECTV-approved satellite installation.

88.     The piece-rate system only pays technicians for certain enumerated "productive" tasks—tasks that DIRECTV listed on a standardized rate card—but fails to compensate technicians for all necessary work they perform.

89.     In addition to the certain tasks DIRECTV designated as compensable, Plaintiffs performed other work each week during the relevant time period for Defendants, such as assembling satellite dishes, driving to and between job assignments, reviewing and receiving schedules, calling customers to confirm installations, obtaining required supplies, assisting other technicians with installations, performing required customer educations, contacting DIRECTV to report in or activate service, working on installations that were not completed, and working on "rollback" installations where Plaintiffs had to return and perform additional work on installations previously completed.

90.     Plaintiffs were not paid for these integral and indispensable tasks that were necessary to their principal activity of installing and repairing DIRECTV satellite television service.

91.     Although Plaintiffs worked more than forty hours per week, as set forth in more detail below, they were not compensated for these "nonproductive" tasks. Accordingly, to the extent W-2 technician Plaintiffs' pay was translated to a "regular rate" (as required by the FLSA for calculating overtime due to piece-workers), Plaintiffs' regular rate did not reflect compensation for all hours worked and they were not properly compensated for overtime hours, if at all.

92.     Defendants did not pay Plaintiffs' wages free and clear. Rather, Plaintiffs were subjected to "chargebacks" wherein Defendants would deduct amounts from Plaintiffs' pay if there were issues with an installation, or questions from the customer, generally up to 90 days

after the customer's service was activated. The chargeback would occur for a variety of reasons, many of which were out of Plaintiffs' control, including, for example, faulty equipment, customer calls regarding how to operate their remote control, or a customer's failure to give greater than a 95% satisfaction rating for the services provided by the technician.

93.     In addition to chargebacks, independent contractor Plaintiffs were also required to purchase supplies necessary to perform installations, such as screws, poles, concrete, and cables; and independent contractor plaintiffs were also required to provide all maintenance and purchase all the gas used in the vehicle they drove between DIRECTV customers' homes. Nor were these independent contractors paid an overtime premium for work done beyond 40 hours in a workweek.

94.     These required business expenses were incurred for DIRECTV's financial benefit and reduced the wages of these technicians.

95.     Plaintiffs, in virtually every workweek, worked more than 40 hours per week for DIRECTV, as alleged in more detail below.

96.     Plaintiffs were not paid the overtime premium required by applicable law for work done beyond 40 hours in a given workweek.

97.     The policy and practice of imposing "chargebacks," failing to compensate Plaintiffs for all hours worked, and failing to reimburse Plaintiffs' necessary business expenses resulted in Plaintiffs routinely working more than forty hours in a work week while being denied overtime pay and being subjected to an effective wage rate below that required by applicable law.

98.     Plaintiffs intend to prove that DIRECTV's piece-rate pay system fails to comply with applicable law, and constitutes an effort to deliberately deny Plaintiffs earned wages and overtime compensation in violation of the FLSA.

## LITIGATION HISTORY

### *Lang v. DIRECTV*

99.     Plaintiffs Anthony DeMarco, Edward Hart, Michael Healey, Roger Johnson, Jr., Mark Kornytchuk, Joseph Manzo, and Alex Mirosh previously opted in to a conditionally certified FLSA action pending in the Eastern District of Louisiana styled *Lang v. DIRECTV*, Case No. 10-1085-NJB. The *Lang* case was pending as a collective action until the court, on September 3, 2013, granted the parties' joint motion decertifying the class, dismissed the opt-in plaintiffs' claims without prejudice to pursuing the individual claims raised herein, and ordered the statute of limitations for each opt-in plaintiff to continue to be tolled for 60 days from the date of the order. *Lang v. DIRECTV*, Case No. 10-1085-NJB (E.D. La.) (Docs. 466, 466-1; Doc. 467, Order).

100.     Within the 60 days granted by the *Lang* court, Plaintiffs Anthony DeMarco, Edward Hart, Michael Healey, Roger Johnson, Jr., Mark Kornytchuk, Joseph Manzo, and Alex Mirosh herein subsequently filed this action in the Central District of California on November 1, 2013. *DeMarco v. DirecTV*, Case No. 13-8127 ABC (Ex) (Doc. 1). On July 22, 2014, the court entered an order granting Defendants' Motion to Transfer Pursuant to 28 U.S.C. § 1404(a) and denying as moot and without prejudice Defendants' Motion to Sever Claims of Plaintiffs and Motion to Sever Defendants (Doc. 64), finding, pursuant to the parties' stipulation, that the District of New Jersey was the appropriate District for this action. (Doc. 64).

*Arnold v. DIRECTV*

101.     Plaintiffs Suleyman Aliyev, Carlos Beltre Perez, Diogenes Polanco, and Mario Romero previously filed consents to become party plaintiffs in *Arnold v. DIRECTV*, Case No. 10-0352-JAR, a collective action pending in the Eastern District of Missouri. Pursuant to a Proposed Case Management Plan and Order (Docs. 200, 216), the court dismissed without prejudice the claims of certain opt-in plaintiffs who did not fit into a subclass, (Doc. 220), including Suleyman Aliyev, Carlos Beltre Perez, and Diogenes Polanco, without prejudice to pursuing the individual claims raised herein, and ordered the statute of limitations for each opt-in plaintiff to continue to be tolled for 90 days from the date of the order. *Arnold v. DIRECTV*, Case No. 10-0325-JAR (E.D. Mo.) (Doc. 221, Notice of Voluntary Decertification; Doc. 244, Order).[6]

102.     Within the 90 days granted by the *Arnold* court, Plaintiffs Suleyman Aliyev, Carlos Beltre Perez, Diogenes Polanco, and Mario Romero[7] joined their individual claims in this action.

## PLAINTIFFS' CLAIMS

**Anthony DeMarco**

103.     Plaintiff Anthony DeMarco is an individual residing in the state of New Jersey. Although Anthony DeMarco was treated as an independent contractor, under the FLSA he was employed by DIRECTV and Multiband.

---

[6] Plaintiff Carlos Beltre Perez is not identified on the list of opt-in plaintiffs dismissed from *Arnold* because certain of his claims–those for time served as a W-2 employee of DirectSat and not for time claimed herein–remain active in *Arnold*.

[7] Plaintiff Mario Romero is not identified on the list of opt-in plaintiffs dismissed from *Arnold* because certain of his claims–those for time served as a W-2 employee of MasTec and not for time claimed herein–were compelled to arbitration out of *Arnold*.

104.   In virtually every workweek between approximately June 2004 and June 2011, Anthony DeMarco worked more than 40 hours per week as a technician for DIRECTV, Multiband, Ironwood Communications, Directech NE, and Lentech, Inc. in the state of New Jersey, and was unlawfully deprived of overtime compensation.[8]

105.   In fact, Anthony DeMarco spent approximately 50 to 60 hours per week performing tasks for the benefit of DIRECTV and Multiband. Of those 50 to 60 hours, 20 to 25 hours were spent working for Defendants' benefit on tasks not assigned a piece rate and which were thus unpaid.

106.   Defendants' employment policies and practices detailed herein (*i.e.*, imposing "chargebacks" in varying amounts but often $75 to $96 per week, failing to compensate Anthony DeMarco for all hours worked, and failing to reimburse Anthony DeMarco's necessary business expenses averaging $1700 per month) resulted in further unlawful reduction of Anthony DeMarco's compensation.

107.   Anthony DeMarco does not have all the documents or records possessed by Defendants that bear on his damages. Based on his recollection, Anthony DeMarco estimates that in a given workweek, he would work 55 hours, 23 hours of which were unpaid; he would be subject to chargebacks of $86 per week; and would be paid $650 per week, which would be reduced by unreimbursed business expenses of $425 per week.

108.   Anthony DeMarco brings his claims against DIRECTV and Multiband.

---

[8] Exceptions to a typical workweek might include days in which work was not performed, i.e., due to weather, a holiday, illness, or otherwise.

**Edward Hart**

109.    Plaintiff Edward Hart is an individual residing in the state of New Jersey. Although Edward Hart was treated as an independent contractor, under the FLSA he was employed by DIRECTV and Multiband.

110.    In virtually every workweek between approximately March 2011 and February 2012, Edward Hart worked more than 40 hours per week as a technician for DIRECTV, Multiband, Directech NE, and Lentech, Inc. in the state of New Jersey, and was unlawfully deprived of overtime compensation.[9]

111.    In fact, Edward Hart spent approximately 80 hours per week performing tasks for the benefit of DIRECTV and Multiband. Of those 80 hours, many hours were spent working for Defendants' benefit on tasks not assigned a piece rate and which were thus unpaid.

112.    Defendants' employment policies and practices, detailed herein (*i.e.*, imposing "chargebacks" in varying amounts but often $35 each, failing to compensate Edward Hart for all hours worked, and failing to reimburse Edward Hart's necessary business expenses averaging $585 per month) resulted in further unlawful reduction of Edward Hart's compensation.

113.    Edward Hart does not have all the documents or records possessed by Defendants that bear on his damages. Based on his recollection, Edward Hart estimates that, in a given workweek, he would work 80 hours, many hour of which were unpaid; he would be subject to chargebacks of $35 per week; and would be paid $1200 per week, which would be reduced by unreimbursed business expenses of $147 per week.

114.    Edward Hart brings his claims against DIRECTV and Multiband.

---

[9] Exceptions to a typical workweek might include days in which work was not performed, i.e., due to weather, a holiday, illness, or otherwise.

**Michael Healey**

115.   Plaintiff Michael Healey is an individual residing in the state of New Jersey. Although Michael Healey was treated as an independent contractor, under the FLSA he was employed by DIRECTV and Multiband.

116.   In virtually every workweek between approximately June 2006 and April 2010, Michael Healey worked more than 40 hours per week as a technician for DIRECTV, Ironwood Communications, Directech NE, DirectSat, Multiband, Lentech, Inc., and Bluewater Communication Group in the state of New Jersey, and was unlawfully deprived of overtime compensation.[10]

117.   In fact, Michael Healey spent approximately 50 to 60 hours per week performing tasks for the benefit of DIRECTV. Of those 50 to 60 hours, 25 to 30 hours were spent working for Defendants' benefit on tasks not assigned a piece rate and which were thus unpaid.

118.   Defendants' employment policies and practices, detailed herein (*i.e.*, imposing "chargebacks" in varying amounts but often $25 to $50 per week, failing to compensate Michael Healey for all hours worked, and failing to reimburse Michael Healey's necessary business expenses averaging $1260 to $1800 per month) resulted in further unlawful reduction of Michael Healey's compensation.

119.   Michael Healey does not have all the documents or records possessed by Defendants that bear on his damages. Based on his recollection, Michael Healey estimates that, in a given workweek he would work 55 hours, 28 hours of which were unpaid; he would be subject to chargebacks of $38 per week; and would be paid $1300 per week, which would be reduced by unreimbursed business expenses of $383 per week.

---

[10] Exceptions to a typical workweek might include days in which work was not performed, i.e., due to weather, a holiday, illness, or otherwise.

120.     Michael Healey brings his claims against DIRECTV.

**Roger Johnson, Jr.**

121.     Plaintiff Roger Johnson, Jr. is an individual residing in the state of New Jersey. Although Roger Johnson, Jr. was treated as an independent contractor, under the FLSA he was employed by DIRECTV and Multiband.

122.     In virtually every workweek between approximately December 2003 and February 2012, Roger Johnson, Jr., worked more than 40 hours per week as a technician for DIRECTV, Multiband, Directech NE, and Lentech, Inc. in the state of New Jersey, and was unlawfully deprived of overtime compensation.[11]

123.     In fact, Roger Johnson, Jr., spent approximately 60 to 65 hours per week performing tasks for the benefit of DIRECTV and Multiband. Of those 60 to 65 hours, 25 to 30 hours were spent working for Defendants on tasks not assigned a piece rate and which were thus unpaid.

124.     Defendants' employment policies and practices, detailed herein (*i.e.*, imposing "chargebacks" in varying amounts but often $75 per week, failing to compensate Roger Johnson, Jr., for all hours worked, and failing to reimburse Roger Johnson, Jr.'s necessary business expenses averaging $2320 to $2720 per month) resulted in further unlawful reduction of Roger Johnson, Jr.'s compensation.

125.     Roger Johnson, Jr. does not have all the document or records possessed by Defendants that bear on his damages. Based on his recollection, Roger Johnson Jr. estimates that, in a given workweek, he would work 63 hours, 28 hours of which were unpaid; he would be

---

[11] Exceptions to a typical workweek might include days in which work was not performed, i.e., due to weather, a holiday, illness, or otherwise.

subject to chargebacks of $75 per week; and would be paid $1000 per week, which would be reduced by unreimbursed business expenses of $630 per week.

126.    Roger Johnson, Jr. brings his claims against DIRECTV and Multiband.

**Mark Kornytchuk**

127.    Plaintiff Mark Kornytchuk is an individual residing in the state of New Jersey. For a period of time, between February 2005 and May 2012, Mark Kornytchuk was treated as an independent contractor, for another period of time, between December 2014 and the present; he was treated as a W-2 technician. For all of his time working as a technician, under the FLSA he was employed by DIRECTV and Multiband.

128.    In virtually every workweek between approximately February 2005 and the present, Mark Kornytchuk worked more than 40 hours per week as a technician for DIRECTV, Multiband, Directech NE, Ironwood Communications, and Lentech, Inc. in the state of New Jersey, and was unlawfully deprived of overtime compensation.[12]

129.    In fact, Mark Kornytchuk spent approximately 50 to 60 hours per week performing tasks for the benefit of DIRECTV and Multiband. Of those 50 to 60 hours, 20 hours were spent working for Defendants' benefit on tasks not assigned a piece rate and which were thus unpaid.

130.    Defendants' employment policies and practices, detailed herein (*i.e.*, imposing "chargebacks" in varying amounts but often $50 to $125 per week, failing to compensate Mark Kornytchuk for all hours worked, and failing to reimburse Mark Kornytchuk's necessary

---

[12] Exceptions to a typical workweek might include days in which work was not performed, i.e., due to weather, a holiday, illness, or otherwise. Specifically, Mark Kornytchuk has a gap in his DIRECTV employment from June 2012 to December 2014.

business expenses averaging $1360 to $1400 per month[13]) resulted in further unlawful reduction of Mark Kornytchuk's compensation.

131.    Mark Kornytchuk does not have all the documents or records possessed by Defendants that bear on his damages. Based on his recollection, Mark Kornytchuk estimates that, in a given workweek, he would work 55 hours, 20 hours of which were unpaid; he would be subject to chargebacks of $88 per week; and would be paid $1200 per week, which would be reduced by unreimbursed business expenses of $345 per week.

132.    Mark Kornytchuk brings his claims against DIRECTV and Multiband.

**Joseph Manzo**

133.    Plaintiff Joseph Manzo is an individual residing in the state of New Jersey. Although Joseph Manzo was treated as an independent contractor, under the FLSA he was employed by DIRECTV and Multiband.

134.    In virtually every workweek between approximately 2005 and December, 2011, Joseph Manzo worked more than 40 hours per week as a technician for DIRECTV, Multiband, Ironwood Communications, Lentech, Inc., and Bluewater Communication Group in the state of New Jersey, and was unlawfully deprived of overtime compensation.[14]

135.    In fact, Joseph Manzo spent approximately 50 to 60 hours per week performing tasks for the benefit of DIRECTV and Multiband. Of those 50 to 60 hours, 15 to 20 were spent working for Defendants' benefit on tasks not assigned a piece rate and which were thus unpaid.

136.    Defendants' employment policies and practices, detailed herein (*i.e.*, imposing "chargebacks" in varying amounts but often $175 per week, failing to compensate Joseph Manzo

---

[13] Exception to unreimbursed business expenses were the workweeks when Mark Kornytchuk worked as a W-2 employee for DIRECTV and Multiband.
[14] Exceptions to a typical workweek might include days in which work was not performed, i.e., due to weather, a holiday, illness, or otherwise.

for all hours worked, and failing to reimburse Joseph Manzo's necessary business expenses averaging $710 per month) resulted in further unlawful reduction of Joseph Manzo's compensation.

137.   Joseph Manzo does not have all the documents or records possessed by Defendants that bear on his damages. Based on his recollection, Joseph Manzo estimates that in a given workweek, he would work 55 hours, 18 hours of which were unpaid; he would be subject to chargebacks of $175 per week; and would be paid $1300 per week, which would be reduced by unreimbursed business of $178 per week.

138.   Joseph Manzo brings his claims against DIRECTV and Multiband.

**Alex Mirosh**

139.   Plaintiff Alex Mirosh is an individual residing in the state of New York. Although Alex Mirosh was treated as an independent contractor, under the FLSA he was employed by DIRECTV and DirectSat.

140.   In virtually every workweek between approximately November 2009 and April 2012, Alex Mirosh worked more than 40 hours per week as a technician for DIRECTV, DirectSat, and Star Tech Inc. in the state of New Jersey, and was unlawfully deprived of overtime compensation.[15]

141.   In fact, Alex Mirosh spent approximately 70 to 80 hours per week performing tasks for the benefit of DIRECTV and DirectSat. Of those 70 to 80 hours, 30 to 40 hours were spent working for Defendants' benefit on tasks not assigned a piece rate and which were thus unpaid.

---

[15] Exceptions to a typical workweek might include days in which work was not performed, i.e., due to weather, a holiday, illness, or otherwise.

142.     Defendants' employment policies and practices, detailed herein (*i.e.*, imposing "chargebacks" in varying amounts but often $100 per week, failing to compensate Alex Mirosh for all hours worked, and failing to reimburse Alex Mirosh's necessary business expenses averaging $400 per month), resulted in further unlawful reduction of Alex Mirosh's compensation.

143.     Alex Mirosh does not have all the documents or records possessed by Defendants that bear on his damages. Based on his recollection, Alex Mirosh estimates that, in a given workweek, he would work 75 hours, 35 hours of which were unpaid; he would be subject to chargebacks of $100 per week; and would be paid $1200 per week, which would be reduced by unreimbursed business expenses of $100 per week.

144.     Alex Mirosh brings his claims against DIRECTV and DirectSat.

**Suleyman Aliyev**

145.     Plaintiff Suleyman Aliyev is an individual residing in the state of New York. Although Suleyman Aliyev was treated as an independent contractor, under the FLSA he was employed by DIRECTV and Multiband.

146.     In virtually every workweek between approximately March 2009 and July 2014, Suleyman Aliyev worked more than 40 hours per week as a technician for DIRECTV, Multiband, and All Tach USA Inc. in the state of New Jersey, and was unlawfully deprived of overtime compensation.[16]

147.     In fact, Suleyman Aliyev spent approximately 60 to 72 hours per week performing tasks for the benefit of DIRECTV and Multiband. Of those 60 to 72 hours, 15 hours

---

[16] Exceptions to a typical workweek might include days in which work was not performed, i.e., due to weather, a holiday, illness, or otherwise.

were spent working for Defendants' benefit on tasks not assigned a piece rate and which were thus unpaid.

148.    Defendants' employment policies and practices, detailed herein (*i.e.*, imposing "chargebacks" in varying amounts but often $150 to $200 per week, failing to compensate Suleyman Aliyev for all hours worked, and failing to reimburse Suleyman Aliyev's necessary business expenses averaging $1600 to $2000 per month), resulted in further unlawful reduction of Suleyman Aliyev's compensation.

149.    Suleyman Aliyev does not have all the documents or records possessed by Defendants that bear on his damages. Based on his recollection, Suleyman Aliyev estimates that, in a given workweek, he would work 66 hours, 15 hours of which were unpaid; he would be subject to chargebacks of $175 per week; and would be paid $1050 per week, which would be reduced by unreimbursed business expenses of $450 per week.

150.    Suleyman Aliyev brings his claims against DIRECTV and Multiband.

**Carlos Beltre Perez**

151.    Plaintiff Carlos Beltre Perez is an individual residing in the state of New Jersey. Although Carlos Beltre Perez was treated as an independent contractor, under the FLSA he was employed by DIRECTV.

152.    In virtually every workweek between approximately February 2009 and December 2009, Carlos Beltre Perez worked more than 40 hours per week as a technician for DIRECTV, DirectSat, and Impact Satellite Inc. in the state of New Jersey, and was unlawfully deprived of overtime compensation.[17]

---

[17] Exceptions to a typical workweek might include days in which work was not performed, i.e., due to weather, a holiday, illness, or otherwise.

153.    In fact, Carlos Beltre Perez spent approximately 40 to 70 hours per week performing tasks for the benefit of DIRECTV. Of those 40 to 70 hours, 10 hours were spent working for Defendants' benefit on tasks not assigned a piece rate and which were thus unpaid.

154.    Defendants' employment policies and practices, detailed herein (*i.e.*, imposing "chargebacks" in varying amounts but often $150 to $400 per week, failing to compensate Carlos Beltre Perez for all hours worked, and failing to reimburse Carlos Beltre Perez' necessary business expenses averaging $1000 per month), resulted in further unlawful reduction of Carlos Beltre Perez' compensation.

155.    Carlos Beltre Perez does not have all the documents or records possessed by Defendants that bear on his damages. Based on his recollection, Carlos Beltre Perez estimates that, in a given workweek, he would work 55 hours, 10 hours of which were unpaid; he would be subject to chargebacks of $275 per week; and would be paid $1200 per week, which would be reduced by unreimbursed business expenses of $250 per week.

156.    Carlos Beltre Perez brings his claims against DIRECTV.

**Diogenes Polanco**

157.    Plaintiff Diogenes Polanco is an individual residing in the state of New Jersey. For a period of time, between 2008 and 2011, Diogenes Polanco was treated as an independent contractor; for another period of time, between 2011 and the present, he was treated as a W-2 technician. For all of his time working as a technician, under the FLSA he was employed by DIRECTV and DirectSat.

158.    In virtually every workweek between approximately 2008 and the present, Diogenes Polanco worked more than 40 hours per week as a technician for DIRECTV,

DirectSat, Directech NE, and Multiband in the state of New Jersey, and was unlawfully deprived of overtime compensation.[18]

159.    In fact, Diogenes Polanco spent approximately 45 to 75 hours per week performing tasks for the benefit of DIRECTV, Multiband, and DirectSat. Of those 45 to 75 hours, 10 to 35 hours were spent working for Defendants' benefit on tasks not assigned a piece rate and which were thus unpaid.

160.    Defendants' employment policies and practices, detailed herein (*i.e.*, imposing "chargebacks" in varying amounts but often $150 per month, failing to compensate Diogenes Polanco for all hours worked, and failing to reimburse Diogenes Polanco's necessary business expenses averaging $920 to $1600 per month[19]), resulted in further unlawful reduction of Diogenes Polanco's compensation.

161.    Diogenes Polanco does not have all the documents or records possessed by Defendants that bear on his damages. Based on his recollection, Diogenes Polanco estimates that, in a given workweek, he would work 60 hours, 23 hours of which were unpaid; he would be subject to chargebacks; and would be paid $750 per week, which would be reduced by unreimbursed business expenses of $315 per week.

162.    Diogenes Polanco brings his claims against DIRECTV and DirectSat.

**Mario Romero**

163.    Plaintiff Mario Romero is an individual residing in the state of New Jersey.

164.    In virtually every workweek between approximately 2009 and October 2014, Mario Romero worked more than 40 hours per week for DIRECTV and DirectSat as a W-2

---

[18] Exceptions to a typical workweek might include days in which work was not performed, i.e., due to weather, a holiday, illness, or otherwise.

[19] Exception to unreimbursed business expenses and chargebacks were the workweeks when Diogenes Polanco worked as a W-2 employee.

technician of DirectSat in the state of New Jersey, and was unlawfully deprived of overtime compensation.[20]

165.    In fact, Mario Romero spent approximately 50 hours per week performing tasks for the benefit of DIRECTV and DirectSat. Of those 50 hours, 20 hours were spent working for Defendants' benefit on tasks not assigned a piece rate and which were thus unpaid.

166.    Defendants' employment policies and practices, detailed herein (*i.e.*, failing to compensate Mario Romero for all hours worked and failing to reimburse Mario Romero's necessary business expenses averaging $840 per month), resulted in further unlawful reduction of Mario Romero's compensation.

167.    Mario Romero does not have all the documents or records possessed by Defendants that bear on his damages. Based on his recollection, Mario Romero estimates that, in a given workweek, he would work 50 hours, 20 hours of which were unpaid and would be paid $675 per week, which would be reduced by unreimbursed business expenses of $210 per week.

168.    Mario Romero brings his claims against DIRECTV and DirectSat.

## COUNT I

### Violation of the Fair Labor Standards Act of 1938

*By each Plaintiff individually against Plaintiff's previously identified Defendant(s)*

169.    Plaintiffs re-allege all allegations set forth above.

170.    At all times material herein, Plaintiffs have been entitled to the rights, protections, and benefits provided under the FLSA, 29 U.S.C. §§ 201, *et seq.*

---

[20] Exceptions to a typical workweek might include days in which work was not performed, i.e., due to weather, a holiday, illness, or otherwise. Specifically, Mario Romero has a gap in his DirectSat employment from the end of 2011 to January 2013, during which time he was working for MasTec; his claim for this time is subject to an arbitration agreement and is being pursued in an individual arbitration.

171.    The FLSA regulates, among other things, the payment of overtime pay by employers whose employees are engaged in interstate commerce, or engaged in the production of goods for commerce, or employed in an enterprise engaged in commerce or in the production of goods for commerce. 29 U.S.C. § 207(a)(1).

172.    The FLSA also regulates, among other things, the payment of minimum wage by employers whose employees are engaged in interstate commerce, or engaged in the production of goods for commerce, or employed in an enterprise engaged in commerce or in the production of goods for commerce.  29 U.S.C. § 206(a).

173.    Defendants are subject to the minimum wage and overtime pay requirements of the FLSA because they are enterprises engaged in interstate commerce and their employees are engaged in commerce.

174.    Defendants violated the FLSA by failing to pay all minimum wage and overtime wages due to Plaintiffs, failing to properly calculate Plaintiffs' regular rate of pay for determining the overtime premium pay owed, and improperly deducting money from Plaintiffs' pay.

175.    As to defendant DIRECTV, Plaintiffs are entitled to damages equal to the mandated minimum wage and overtime premium pay within the three years preceding the filing their consent to join forms in the *Lang* or *Arnold* litigation, plus periods of equitable tolling,[21]

---

[21] Former *Arnold* Plaintiffs Suleyman Aliyev, Carlos Beltre Perez, Diogenes Polanco, and Mario Romero are entitled to an additional six months of tolling on their claims against DIRECTV per the law of the case. The *Arnold* court ordered a period of tolling on the running of the opt-ins' limitations period during a discovery stay while DIRECTV's motion to dismiss was pending. (*Arnold* Docs 46, 49). The period of tolling was 180 days, which, added to the applicable three year period gives former *Arnold* Plaintiffs' claims against DIRECTV a three-and-a-half year lookback from the date each opt-in joined that action.

because DIRECTV acted willfully and knew or showed reckless disregard in its violation of the FLSA.

176.    As to the Provider Defendant(s) against which each Plaintiff makes a claim, Plaintiffs are entitled to damages equal to the mandated minimum wage and overtime premium pay within the three years preceding the filing their (1) original complaint in this action, *i.e.*, November 1, 2013[22] or (2) this amended complaint,[23] plus periods of equitable tolling, because Provider Defendant(s) acted willfully and knew or showed reckless disregard in its violation of the FLSA.

177.    Defendants violated the FLSA by failing to pay all wages due to Plaintiffs, failing to properly calculate Plaintiffs' regular rate of pay for determining the overtime premium pay owed, and improperly deducting money from Plaintiffs' pay.

178.    Pursuant to Defendants' policies and practices, Defendants willfully violated the FLSA by refusing and failing to pay Plaintiffs overtime and minimum wages. In the course of perpetrating these unlawful practices, Defendants willfully failed to keep accurate records of all hours worked by, compensation paid to, and expenses incurred by Plaintiffs.

179.    Defendants' unlawful conduct was willful because, among other reasons described herein, DIRECTV and other members of the Provider Network knew, or should have known, that the fissured employment scheme utilized a piece-rate system(s) that unlawfully denied Plaintiffs minimum wage, overtime wage, and other employment benefits. Those systems have been challenged in numerous lawsuits around the country in which DIRECTV, Multiband, DirectSat, as well as other HSP members of DIRECTV's Provider Network, have all been

---

[22] Plaintiffs Anthony DeMarco, Edward Hart, Roger Johnson, Jr., Mark Kornytchuk, Joseph Manzo, and Alex Mirosh.

[23] Plaintiffs Suleyman Aliyev, Diogenes Polanco, and Mario Romero.

defendants.  Indeed DIRECTV recently settled a lawsuit brought the U.S. Department of Labor in the United States District Court for the Western District of Washington after that court granted summary judgment in favor of the DOL regarding DIRECTV's status as an employer of technicians like the Plaintiff herein. That action challenged DIRECTV's piece-rate compensation system, a system essentially identical to the system(s) being challenged in this case.

180.    Defendants have acted neither in good faith nor with reasonable grounds to believe that their actions and omissions were not a violation of the FLSA. As a result thereof, Plaintiffs are each entitled to recover an award of liquidated damages in an amount equal to the amount of unpaid wages as described by Section 16(b) of the FLSA, codified at 29 U.S.C. § 216(b). Alternatively, should the Court find Defendants acted in good faith in failing to pay Plaintiffs minimum wage and overtime compensation, Plaintiffs are each entitled to an award of prejudgment interest at the applicable legal rate.

181.    As a result of these violations of the FLSA's minimum wage and overtime pay provisions, compensation has been unlawfully withheld from Plaintiffs by Defendants. Accordingly, pursuant to 29 U.S.C. § 216(b), Defendants are liable for the unpaid minimum wages and overtime premium pay along with an additional amount as liquidated damages, pre-judgment and post-judgment interest, reasonable attorneys' fees, and costs of this action.

182.    Plaintiffs request relief as described below and as permitted by law.

**WHEREFORE**, Plaintiffs request the Court enter judgment for Plaintiffs individually and:

    a.   Award damages for unpaid minimum wages and unpaid overtime wages under 29 U.S.C. § 216(b);

    b.   Award liquidated damages under 29 U.S.C. § 216(b);

c.  Award damages including wages or other compensation lost as a result of the misclassification;

d.  Award reasonable attorneys' fees under the Fair Labor Standards Act;

e.  Award pre-judgment interest;

f.  Award costs of suit under 29 U.S.C. § 216(b); and

g.  Grant any further relief that the Court may deem just and equitable.

Dated: February 24, 2016                    Respectfully submitted,

**WINEBRAKE & SANTILLO, LLC**

By:  s/ R. Andrew Santillo
R. Andrew Santillo
Mark J. Gottesfeld
Twining Office Center
715 Twining Road, Suite 211
Dresher, Pennsylvania 19025
E-mail:  asantillo@winebrakelaw.com
E-Mail: mgottesfeld@winebrakelaw.com
Phone: 215.884.2491
Facsimile:  215.884.2492

**STUEVE SIEGEL HANSON LLP**

George A. Hanson, *Admitted PHV*
MO Bar No. 43450
460 Nichols Road, Suite 200
Kansas City, Missouri 64112
Telephone:      816-714-7100
Facsimile:      816-714-7101
Email:  hanson@stuevesiegel.com

Ryan D. O'Dell, *Admitted PHV*
500 West C Street, Suite 1750
San Diego, California 92101
Telephone:      619-400-5822
Facsimile:      619-400-5832
Email: odell@stuevesiegel.com

*Attorneys for Plaintiffs*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on February 24, 2016, a copy of the foregoing Second Amended Complaint was filed electronically. Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing. Parties may access this filing through the Court's CM/ECF System.

<div style="margin-left:40%">

s/  R. Andrew Santillo
R. Andrew Santillo
Winebrake & Santillo, LLC
Twining Office Center
715 Twining Road, Suite 211
Dresher, Pennsylvania 19025
Phone:  215.884.2491
Facsimile:  215.884.2492
E-mail:  asantillo@winebrakelaw.com

**Counsel for Plaintiffs**

</div>